ENTERED

MAY - 4 2007

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

FILED

MAY - 4 2007

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re: | Case No.  RS 04-19353 PC |
| COUNT LIBERTY, LLC, | <u>Jointly Administered With</u> |
| and | Case No. RS 04-19355 PC |
| WEST-ALL PROPERTIES, LLC, | Chapter 7 |
| | Date:  May 2, 2007<br>Time:  9:00 a.m.<br>Place: U.S. Bankruptcy Court<br>            Courtroom 303 |
| Debtors. | 3420 Twelfth Street<br>Riverside, CA 92501 |

**MEMORANDUM DECISION**

On May 2, 2007, the court conducted an evidentiary hearing pursuant to its

Amended Order Directing Jan A. Kalicki, Rosalind J. Kalicki, and Dennis Winters, Esq.,

to Appear and to Show Cause Why They Should not Account for Missing Funds and be

Sanctioned and/or Ordered to Disgorge Fees for Violation of this Court's Order Entered

on February 9, 2005 ("Amended OSC").  Jan A. Kalicki and Rosalind J. Kalicki

appeared <u>pro se</u>, Dennis Winters appeared on behalf of Debtors, Count Liberty, LLC

and West-All Properties, LLC, and James Jay Stoffel appeared for Daniel L. Muhe and

Financial Freedom Loans, Inc. (collectively, "Muhe").  The court, having considered its

Amended OSC and the responses thereto, the evidentiary record, and arguments of

counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed.

R. Civ. P. 52, as incorporated into Fed. R. Bankr. P. 7052 and made applicable to

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.
To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.
The court reserves the right to make additional findings and conclusions as necessary or as may be
requested by any party.

1  contested matters by Fed. R. Bankr. P. 9014(c).

2  I. STATEMENT OF FACTS

3  A.    <u>Commencement of Chapter 11 Cases</u>.

4         On August 11, 2004, Count Liberty, LLC ("Count Liberty") and West-All

5  Properties, LLC ("West-All") filed separate voluntary petitions for reorganization under

6  chapter 11 of the Code.[2]  Jan A. Kalicki ("Kalicki") is the president of both Count Liberty

7  and West-All.  Rosalind J. Kalicki is a secretary-treasurer of each corporation.  On

8  October 5, 2004, an Order Authorizing Employment of Counsel was entered authorizing

9  West-All to employ Dennis Winters ("Winters") as general counsel for West-All, as

10  debtor in possession.  A similar order was entered in the <u>Count Liberty</u> case on October

11  19, 2004.  On October 26, 2004, the court ordered that the bankruptcy estates of <u>West-</u>

12  <u>All</u> and <u>Count Liberty</u> be jointly administered under Case No. RS 04-19353-PC.

13  B.    <u>Sale of Carlsbad Property</u>.

14         On December 21, 2004, Count Liberty and West-All filed a motion seeking

15  authority to sell the real property and improvements at 2782 Arland Road, Carlsbad,

16  California ("Carlsbad Property"), free and clear of liens, to Robert and Amie Destremps

17  for the sum of $1,225,000 pursuant to § 363(b)(1) and § 363(f).  Winters signed and

18  filed the motion as attorney for Count Liberty and West-All.  Because Muhe asserted a

19  lien against the Carlsbad Property that was disputed by West-All, Winters represented

20  in the motion that "[t]he Debtor will segregate the proceeds after payment of closing

21  costs and taxes, and will hold the balance pending further Order of the Court."[3]  Winters

22  _____

23  [2] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code,
11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of
2005, Pub. L. 109-8, 119 Stat. 23 (2005).  "Rule" references are to the Federal Rules of Bankruptcy

24  Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R.
Civ. P.").

25

26  [3] Motion to Sell Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate
Brokers, p.2, I.3-4.

27  - 2 -

1  further stated that "[w]hile the sale would be free and clear on [sic] liens, the net

2  proceeds after closing costs, taxes and broker's commissions would be placed in a

3  segregated account with the liens to attach in the priority provided by law.  A

4  subsequent proceeding will be filed to determine the distribution of the proceeds."[4]

5      On January 25, 2005, Count Liberty and West-All filed a Supplemental Reply in

6  Support of Motion to Sell Property Free and Clear of Liens and Pay Administrative

7  Expenses of Real Estate Brokers.  Winters signed and filed the supplemental reply as

8  attorney for Count Liberty and West-All.  In the supplemental reply, Winters stated that

9  ". . . the money will be held in an interest bearing trust account until the amount of

10  Financial Freedom's claim is determined."[5]  At a hearing on February 1, 2005, the court

11  granted the motion of Count Liberty and West-All to sell the Carlsbad property based on

12  findings of fact and conclusions of law made on the record.[6]

13      On February 8, 2005, the court signed an Order Approving Motion To Sell

14  Property Free and Clear of Liens authorizing the sale of the Carlsbad Property to

15  Robert and Amie Destremps for the sum of $1,225,000.  The order specifically

16  provided, in pertinent part, that:

17      ". . . all remaining proceeds are to be placed in a Debtor-in-Possession, interest
        bearing, blocked account; the liens and trust deed shall attach to the remaining
18      net sale proceeds in such account in the order and priority provided by law; the
        funds in said account shall not be used or distributed without further Order from
19      this Court . . ."[7]

20  _____

21  [4] Id. at p.3, l.22-24.

22  [5] Supplemental Reply in Support of Motion to Sell Property Free and Clear of Liens and Pay
     Administrative Expenses of Real Estate Brokers, p.2, l.14-15.
23

     [6] In the minutes of the February 1, 2005 hearing, the court noted: "Net proceeds to be placed in interest-
24   bearing, blocked D-I-P account pending further order of court . . . ."  Minutes of Hearing on Motion to Sell
     Property Free and Clear of Liens and Pay Administrative Expenses of Real Estate Brokers filed December
25   21, 2004.

26  [7] Order Approving Motion To Sell Property Free and Clear of Liens, p.2, l.12-15.

27                                              - 3 -

1   The order, which was prepared by Winters and approved by Muhe's counsel, was

2   entered on February 9, 2005 (the "February 9th order") .

3   C.    Motion to Appoint Chapter 11 Trustee.

4       On April 5, 2005, Muhe filed a Motion to Appoint an Independent Chapter 11

5   Trustee alleging, in pertinent part, that Count Liberty and West-All, through their

6   counsel, Winters, had failed to provide requested information concerning "the

7   segregated bank account in which the one million plus dollars was deposited" following

8   the sale of the Carlsbad Property and had failed to file a February 2005 monthly

9   operating report.[8]  On April 12, 2005, Count Liberty and West-All filed an Opposition to

10  Motion for Appointment of Chapter 11 Trustee ("Trustee Opposition").  Winters signed

11  and filed the Trustee Opposition as attorney for Count Liberty and West-All.  In the

12  Trustee Opposition, Winters represents that "[t]he Debtors are holding the proceeds of

13  the sale of the Arland property in a <u>blocked</u> account, in excess of $1,100,000.00."[9]  In a

14  declaration filed in support of the Trustee Opposition, Kalicki stated under penalty of

15  perjury that:

16      "When the proceeds of the Arland property sale were received, I had the
        proceeds deposited into a Debtor-in-Possession, interest bearing, <u>blocked</u>
17      account, as detailed in the Court's order.  Union Bank Account # 2180042493.
        All the funds remain in the account."[10]
18
19  Winters and Kalicki made similar representations in other responsive pleadings filed

20  with the court.

21      On April 12, 2005, Count Liberty and West-All filed an Opposition to Motion for

22  Relief from Stay filed by Muhe ("Stay Opposition # 1").  Winters signed and filed Stay

23  [8] Declaration of James Jay Stoffel in support of Motion to Appoint Independent Chapter 11 Trustee, p.1,
    l.24 to p.2, l.1.
24
    [9] Trustee Opposition, p.1, l.25-26 (emphasis added).
25
    [10] Declaration of Jan Kalicki in Opposition to Motion for Appointment of Chater [sic] 11 Trustee, p.3, l.8-10
26  (emphasis added).

27                                    - 4 -

1    Opposition # 1 as attorney for Count Liberty and West-All.  In Stay Opposition # 1,

2    Winters again represented that "[t]he Debtors are holding the proceeds of the sale of

3    the Arland property in a blocked account, in excess of $1,100,000.00."[11]

4          On April 12, 2005, Count Liberty and West-All also filed an Opposition to Motion

5    for Turnover of Proceeds of Sale ("Turnover Opposition").  Winters signed and filed the

6    Turnover Opposition as attorney for Count Liberty and West-All.  In the Turnover

7    Opposition, Winters again represented that "[t]he Debtors are holding the proceeds of

8    the sale of the Arland property in a blocked account, in excess of $1,100,000.00."[12]

9    Winters further represents in the Turnover Opposition that "the money is being held in

10   an interest bearing trust account until the amount of Financial Freedom's claim is

11   determined."[13]  In a declaration filed in support of the Turnover Opposition, Kalicki

12   stated under penalty of perjury that "[t]he Debtors are holding the proceeds of the sale

13   of the Arland property in a blocked account, in excess of $1,100,000.00."[14]

14         On April 13, 2005, Count Liberty and West-All filed an Opposition to Motion for

15   Relief from Stay filed by State Street Bank & Trust (Washington Mutual) ("Stay

16   Opposition # 2").  Winters signed and filed Stay Opposition # 2 as attorney for Count

17   Liberty and West-All.  In Stay Opposition # 2, Winters again represented that "[t]he

18   Debtors are holding the proceeds of the sale of the Arland property in a blocked

19   account, in excess of $1,100,000.00."[15]

20

21   _____

22   [11] Stay Opposition # 1, p.2, l.1-2.

23   [12] Turnover Opposition, p.1, l.25-26.

24   [13] Id. at p.3, l.3-4.

25   [14] Declaration of Jan Kalicki in Opposition to Motion for Turnover of Cash Collateral, p.1, l.24-25.

26   [15] Stay Opposition # 2, p.2, l.1-2.

27                                              - 5 -

1  D.    <u>Operating Reports for February & March 2005</u>

2        On April 25, 2005, Winters signed and filed the February 2005 operating report

3  for Count Liberty and West-All.  The report included an interim statement signed by

4  Kalicki under penalty of perjury disclosing Account # 2180042493 as a "Blocked

5  Account"[16] with a balance as of February 28, 2005, of $1,116,000.[17]  The following day,

6  Winters signed and filed the March 2005 operating report for Count Liberty and West-

7  All.  In the interim statement attached to the report, Kalicki again referred to Account #

8  2180042493 as a "Blocked Account"[18] and declared under penalty of perjury that the

9  balance as of March 31, 2005, was $1,116,000.[19]

10  E.    <u>April 26th Hearing</u>

11        On April 26, 2005, the court conducted a hearing on Muhe's Motion to Appoint

12  an Independent Chapter 11 Trustee.  Despite the representations in the operating

13  reports and pleadings filed with the court, Winters was unable to confirm whether

14  Account # 2180042493 had, in fact, been restricted as required by the court's February

15  9th order nor the amount of cash actually deposited into the account following the sale

16  of the Carlsbad Property.[20]  At the conclusion of the hearing, the court

---

18  [16] Debtor in Possession Interim Statement No. 7, ¶ H(2).

19  [17] <u>Id</u>. at ¶ G.

20  [18] Debtor in Possession Interim Statement No. 8, ¶ H(2).

21  [19] <u>Id</u>. at ¶ G.

22  [20] At the hearing, the court and Winters had the following exchange with respect to Account # 2180042493:

23        MR. WINTERS: Your Honor, Union Bank is the bank in which the Debtor has his – Debtors have
24        their Debtor in Possession accounts.  This is a Debtor in Possession account.  The – Mr. Kalicki
          took the order with him to the bank and had him open it based on the – based on the order.  What
25        we got from the bank they don't list who – that it's Debtor in Possession because they never do on
          any of their computer printouts, but it is a Debtor in Possession account.  It is a money market
26        account because it – that's the only way he needed to do to get interest bearing on the account at
          the – at a rate that – and still be able to take money out if the Court orders it, without a – without a

27                                          - 6 -

penalty.

THE COURT: Have you provided the United States Trustee with a copy of the signature card on the account?

MR. WINTERS: I haven't gotten that yet. Mr. Kalicki said that he asked them to send him one and hadn't gotten it yet. He again asked last week and is waiting for it. It hasn't come in. I did, like I say, got the – signed by the – the computer printout signed by the bank.

THE COURT: I don't care what the computer printout says. I want to see the signature card. The Court ordered that the money be deposited in a blocked, interest-bearing, Debtor in Possession bank account at an authorized U.S. Trustee depository.

MR. WINTERS: **It is, your Honor.**

THE COURT: That sentence means that there are a lot of hurdles the Debtor has to overcome. First, it has to be Union Bank's Debtor in Possession bank account, which I understand is an authorized depository, and it has the sufficient collateralization to protect those funds. Secondly, the signature card has to be designated Debtor in Possession bank account so the bank is on notice that this is a court-supervised account.

Thirdly, it has to show that it is a blocked account. So the signature card has to show that no funds are to leave the account absent an order of the Bankruptcy Court.

Can you stand here and tell me that that signature card contains all that information?

MR. WINTERS: I can't because I've not seen the signature card. It's my – all I can tell you is that Mr. Kalicki was on the phone to me when he was at the bank saying "What should I do?" I told them "Give them the order. Tell them this is what needs to be done." That – he was giving them the order and telling them what needed to be done while he was at the bank. I – as indicated, I have not seen the signature card yet. I would suggest if your Honor's concerned about that, we continue this a short period of time –

THE COURT: Concerned?

MR. WINTERS: Your Honor, I –

THE COURT: Concerned is the – that's not even –

MR. WINTERS: Your Honor –

THE COURT: I am shocked that you cannot represent to me that the funds in excess of $1,000,000 in this Union Bank account is not – doesn't have the proper representations on the signature card, after all we went through with respect to the sale, because I – my recollection is that I made it very clear that those funds were to be secured in a blocked, interest-bearing, U.S. Trustee authorized depository pending further order of the Court.

MR. WINTERS: That's why we took the – that's why the order – he took the order with him to the bank, to make sure that they did it right. I mean, if the bank – as I indicated, he gave them a copy of the order. So if they did it wrong, it would be their fault, but I have not – like I say, I've asked for that signature card and not received it. Mr. Kalicki's asked for it and didn't get a copy of it. He

-7-

1  continued the hearing on Muhe's motion stating:

2  Again, the evidence that concerns the Court the most is this issue concerning the
   blocked account. I agree with Mr. Stoffel that the Debtor doesn't need a couple
3  of weeks to come up with the documentation. In fact, the Court is going to give
   the Debtor . . . six days . . . to Monday, May 2nd, at 9:30. That is the motion to
4  appoint a Chapter 11 Trustee in this case. At that time the Debtor is to – or at or
   before the hearing – continued hearing date, the Debtor is to provide a copy of
5  the disbursement statement from the close of escrow on the sale of the property
   showing the amount of funds, the net – the net proceeds from the sale of the
6  property that were to be wired into the Debtor in Possession blocked account, a
   copy of the wire transfer, and a copy of the signature card on the Union Bank
7  account, which I believe is account number 2180042493 at Union Bank in
   Temecula. . . . Now, a copy of each of those documents are to be provided to

8  _____

9
   was going to go down there. They told him he could get a copy of it when he came down, and he
10 hasn't gotten it yet.

11 THE COURT: Ms. Lossing, what proof does the U.S. Trustee require with respect to these types
   of accounts?

12
   MS. LOSSING: Your Honor, it would be a photocopy of the signature card plus a statement from
13 the bank.

14 THE COURT: And did you obtain that or was that requested from Debtor's counsel or the bank
   directly?

15 MS. LOSSING: Directly, no.

16 THE COURT: Do you receive bank reports every 180 days from the U.S. Trustee authorized
   depository showing the balances on deposit in – in Chapter 11 accounts?
17
   MS. LOSSING: That I don't know, your Honor.
18
   THE COURT: I believe the U.S. Trustee receives bank reports directly from its authorized
19 depository showing amounts on deposit.

20 I'm also concerned about the amount on deposit. I haven't seen anything in either the motion nor
   the response in particular that states – that shows me the exact amount of the net proceeds from
21 this sale which would match the amount that was actually placed in the blocked account. I have a
   – a copy of the February interim statement that shows $1,116,000 in a blocked account at Union
22 Bank, account number 2180042493. Then there's a reference to in excess of $1,116,000 in
   another one of the many filings we have.

23 MR. WINTERS: I'm showing a ledger balance when it was opened of $1,116,268.11. That's after
   all the closing costs, that was what was wired into the account by the escrow company. Actually,
24 it was – it was 283, but there was a $12 fee for the – opening the account or whatever, and it
   came out to 268.11. I have a signature on this from Irene Inman who is customer service at the
25 bank.

26 Transcript of Hearing on April 26, 2005, p.11, l.21 to p.15, l.22 (emphasis added).

27                                        - 8 -

Mr. Stoffel, the U.S. Trustee, and the Court. . . . And if that's not done and the Court is not satisfied that <u>there was full compliance with the Court's order and those funds are protected</u> by the continued hearing on – on Monday, May 2nd at 9:30, then we'll take up the appointment of a Chapter 11 Trustee at that time.[21]

On May 2, 2005, the court conducted a continued hearing on Muhe's Motion to Appoint an Independent Chapter 11 Trustee. At the hearing, Winters appeared and tendered to the court a document entitled "Blocked Account Documentation" dated April 29, 2005. Attached were copies of the following documents:

a.     A signature card for Account # 2180042493, styled "West All Properties, LLC, Blocked Account, Chapter 11 Debtor in Possession, Case No. RS 04-19353." No date appears on the signature card, according to the copy. The signature card is signed by Jan Kalicki and Rosalind Kalicki, and states to the right of their signatures under a column entitled "Signing Instructions" - "COURT ORDER REQUIRED TO WITHDRAW FUNDS."

b.     A Seller's Settlement Statement from Chicago Title Company dated February 11, 2005, reflecting $1,116,283.11 in "sale proceeds to court ordered bank act" attributable to the sale of the Carlsbad Property to Robert and Amie Destremps.

c.     A Wire Transfer Detail reflecting a wire transfer of the net sale proceeds of $1,116,283.11 to Union Bank on February 18, 2005.

The Blocked Account Documentation was filed by Winters on May 2, 2005. Based on the Blocked Account Documentation, the court continued the hearing on Muhe's motion to appoint a trustee to June 14, 2005.[22]

F.     Operating Report for April 2005

On June 14, 2005, Winters signed and filed the April 2005 operating report for Count Liberty and West-All. Kalicki signed an interim statement attached to the report declaring under penalty of perjury that the balance in Account # 2180042493 as of April

---

[21] Id. at p.31, l.24 to p.33, l.22 (emphasis added).

[22] At the hearing on May 2, 2005, Winters was not asked whether the $1,116,283.11 was still on deposit in Account # 2180042493 nor did he make any representation to the court regarding the balance in the account as of the date of the hearing.

1    30, 2005, was $1,116,000.[23] Later that day, the court conducted a continued hearing

2    on Muhe's Motion to Appoint an Independent Chapter 11 Trustee. The hearing on the

3    motion was continued to October 25, 2005, and ultimately to November 15, 2005.

4    G.    Dismissal of the Jointly-Administered Cases.

5    　　　　Because Count Liberty and West-All had, among other things, failed to file

6    operating reports and interim statements for the months of May through September

7    2005, the court issued an Order to Show Cause Why Case Should Not Be Dismissed or

8    Converted to a Case Under Chapter 7 Pursuant to 11 U.S.C. § 1112(b). The order was

9    entered on November 1, 2005, setting the matter for hearing on November 15, 2005. In

10   the meantime, Winters signed and filed the operating reports of Count Liberty and

11   West-All for the months of May through September 2005. In each of the interim

12   statements included with the reports, Kalicki declared under penalty of perjury that the

13   ending balance in Account No. 2180042493 was $1,116,000. After a hearing on

14   November 15, 2005, an Order Dismissing Cases With a 180-Day Bar to Refiling was

15   entered on November 16, 2005.

16   　　　　On December 16, 2005, Muhe filed an Ex Parte Application and Memorandum of

17   Points and Authorities for Order Compelling Union Bank to Turn Over Bank Records

18   alleging that Union Bank had wire transferred the funds in Account # 2180042493 to his

19   trust account pursuant to the dismissal order, but that the funds received from Union

20   Bank were $83,294 less than the amount deposited in the blocked account on February

21   15, 2005. Pursuant to Muhe's request, an order was entered on January 3, 2006,

22   directing Union Bank to turn over to James Jay Stoffel, attorney for Muhe, true and

23   correct copies of all bank statements, signature cards, deposit receipts, and withdrawal

24   receipts pertaining to West-All's Account # 2180042493. Shortly thereafter, the jointly-

25   _____

26   [23] Debtor in Possession Interim Statement No. 9, ¶ G.

27

1   administered cases were closed.

2   H.     <u>Reopening of Cases</u>.

3        On May 30, 2006, Muhe filed an <u>ex parte</u> motion seeking to reopen the Count

4   Liberty and West-All cases for cause, alleging that funds deposited in West-All's

5   Account # 2180042493 at Union Bank had been transferred by Kalicki from the blocked

6   account without permission of the court.  On June 7, 2006, an order was entered

7   reopening the cases.

8   I.     <u>Order To Show Cause</u>.

9        Based on an <u>ex parte</u> application and supporting declarations filed by Muhe on

10   June 23, 2006, the court issued an order on June 26, 2006 ("OSC"), directing Kalicki,

11   Rosalind J. Kalicki, Union Bank of California and Winters to appear on August 1, 2006,

12   and to show cause why they should not be required to account for the funds missing

13   from Account # 2180042493 and sanctioned for willful and intentional failure to comply

14   with the court's prior orders concerning the funds in such account.

15        On July 18, 2006, Count Liberty, West-All, Kalicki, Rosalind J. Kalicki and

16   Winters filed a joint Response to Order to Show Cause acknowledging that funds were

17   transferred from Account # 2180042493 to West-All's operating account, but stating

18   that Union Bank and Kalicki "were confused" as to the meaning of the term "blocked

19   account" in the court's February 9th order[24] and that Kalicki "left it entirely to the Bank to

20   correctly determine how the account should be established, based on the Court's

21   order."[25]  They point to Union Bank, arguing that Union Bank "advised there was no

22   restriction on transferring the money to the West-All general account" when Kalicki

23   inquired whether money could be removed from the account to pay certain construction

24   _____

25   [24] Response to Order to Show Cause, p.2, l.14-15.

26   [25] <u>Id</u>. at p.2, l.11-12.

27                                                       - 11 -

1  expenses [26]  According to their response:

2      "Union Bank erred in not initially placing the money into a blocked account as the
       Order provided.  Mr. Kalicki admits he erred in accepting the Bank's
3      representation that there was no bar on transferring the money, without getting
       Court approval.  However, those errs were not intentional.  There was no bad
4      faith, there was no fraud, there was no self-dealing."[27]

5      "In 20/20 hindsight, counsel for both parties should have made the mechanics of
       a blocked account more explicit to the Bank in the Order.  But the Bank's failure
6      to understand what a blocked account was does not create grounds for
       sanctions against Mr. Kalicki or anyone else.  There are no specific directions to
7      the Debtor or Mr. Kalicki that were violated."[28]

8          On July 18, 2006, Union Bank filed a Declaration of Stella Jo Masuda ("Masuda")

9  dated July 18, 2006, in which Masuda states under penalty of perjury that the

10  Commercial Customer Service Unit at Union Bank of California, which assisted West-

11  All in opening Account # 2180042493 on February 14, 2005, was not advised until April

12  28, 2005, that the account was to be blocked.  According to Masuda, Union Bank

13  received an instruction by facsimile transmission on April 28, 2005, to block the

14  account.  On July 28, 2006, Union Bank filed a Supplemental Declaration of Stella Jo

15  Masuda dated July 28, 2006, in which Masuda, responding to Kalicki's declaration,

16  stated:

17      I reviewed the Declaration of Jan Kalicki Re Account filed in response to the
       Motion to Disgorge wherein he states that at the time Business Money Market
18      Account, number 2180042493 (the "2493 Account"), was opened he informed
       the Bank that the 2493 Account should be blocked.  Because his statement is
19      contrary to my recollections and the Bank's records regarding opening of the
       2493 Account, I conducted a further review of documents relating to West-All
20      Properties LLC.  In connection with my review I found a letter which I sent to Mr.
       Kalicki upon the opening of the 2493 Account.  The letter confirms that the 2493
21      Account is subject to the same terms and conditions of the account previously
       opened by West-All Properties, LLC, which was not a blocked account.  Mr.
22      Kalicki counter-signed the letter acknowledging his understanding that the 2493

23  _____

24  [26] Id. at p.2, l.15-17.

25  [27] Id. at p.3, l.23-26.

26  [28] Id. at p.4, l.10-13 (emphasis added).

27                              - 12 -

Account was subject to the same terms and conditions as the previously opened unblocked account."[29]

At the hearing on August 1, 2006, Union Bank's counsel argued that "Union Bank did as instructed, opened an additional account for this Debtor, even sent the Debtor a letter to sign off confirming that this account was being opened on the same terms as the previous account. The Debtor signed off on that letter, provided it back to Union Bank . . . ."[30] The court dismissed its OSC as to Union Bank without prejudice, set a discovery deadline of October 31, 2006, advised Kalicki and Rosalind J. Kalicki to obtain independent counsel, and continued the hearing on the OSC to November 7, 2006. The court also vacated its order dismissing the jointly administered chapter 11 cases, and granted the United States Trustee's motion seeking appointment of a trustee. Christopher R. Barclay ("Barclay") was appointed as chapter 11 trustee.

At the continued hearing on November 7, 2006, the court extended the discovery deadline to December 31, 2006, again admonished Kalicki and Rosalind J. Kalicki to obtain the assistance of counsel, and continued the hearing to January 9, 2007.

On November 15, 2006, the court issued the Amended OSC and, in pertinent part,

ORDERED that Jan A. Kalicki, Rosalind J. Kalicki and Dennis Winters, Esq. . . . show cause why they should not be ordered, jointly and/or severally, to account for all funds withdrawn or transferred from the blocked debtor in possession account, Account # 2180042493, in the name of West-All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California on or after February 18, 2005; . . .

ORDERED that Jan A Kalicki, Rosalind J. Kalicki and Dennis Winters, Esq. . . . show cause why they should not be sanctioned, jointly and/or severally, pursuant to this court's inherent authority for the following bad faith or willful misconduct, to wit: Unauthorized transfers of funds totaling $90,000 from the

---

[29] Supplemental Declaration of Stella Jo Masuda, p.2, l.9-18.

[30] Transcript of Hearing on Order to Show Cause Why the Parties Should Not Be Required to Account for Missing Funds and Assessed Monetary Sanctions, p.16, l.20-24.

blocked debtor in possession account, Account # 2180042493, in the name of West-All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California between March 3, 2005 and April 25, 2005, in violation of this court's prior Order Approving Motion To Sell Property Free and Clear of Liens entered on February 9, 2005 ("Order"), which authorized the sale of the real property and improvements at 2782 Arland Road, Carlsbad, California, to Robert and Amie Destremps for the sum of $1,225,000 and specifically ordered that:

> ". . . all remaining proceeds are to be placed in a Debtor-in-Possession, interest bearing, blocked account; the liens and trust deed shall attach to the remaining net sale proceeds in such account in the order and priority provided by law; <u>the funds in said account shall not be used or distributed without further Order from this Court</u>" (emphasis added); . . .

ORDERED that Dennis Winters, Esq. . . . show cause why he should not be ordered to disgorge attorneys fees, as attorney for the debtors in possession, for breach of his fiduciary duties to the bankruptcy estates of Count Liberty, LLC and West-All Properties, LLC, to wit: (1) failure to exercise reasonable care, as attorney for the debtors in possession, to confirm that estate funds were properly and timely placed in a "Debtor in Possession, interest-bearing, blocked account" in compliance with this court's Order; (2) failure to exercise reasonable care, as attorney for the debtors in possession, to carefully monitor the funds deposited in Account # 2180042493, in the name of West-All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California pursuant to the Order to confirm that such funds were not thereafter used or distributed by the debtors in possession in violation of such Order, and (3) failure to timely disclose, as attorney for the debtors in possession, the transfers of funds from Account # 2180042493, in the name of West-All Properties, LLC, Chapter 11 Debtor in Possession, at Union Bank of California made without prior court authorization in violation of the Order . . . [31]

On November 20, 2006, an order was entered converting the case to chapter 7 and Barclay was appointed as chapter 7 trustee. Kalicki, Rosalind J. Kalicki and Winters filed supplemental responses to the Amended OSC prior to the continued hearing on January 9, 2007. After a sequence of continued status conferences, the parties completed discovery and an evidentiary hearing was conducted on May 2, 2007. The matter was then taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§

---

[31] Amended OSC, p.2, l.5 to p.3, l.15.

- 14 -

1    157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

2    (K) and (O).  Venue is appropriate in this court.  28 U.S.C. § 1409(a).

3    A.      Sanctions Against Kalicki and Rosalind J. Kalicki

4             Winters asserts that "[t]here are no grounds stated in the moving papers under

5    Rule 9011 or the Code for a sanctions award."[32]  Winters argues that sanctions are

6    inappropriate, claiming that West-All and Count Liberty, "the actual recipients of the

7    initial transfers, are not named in the Order to Show Cause"[33] and further, that "[t]here

8    are no representations signed by Mr. Kalicki or anyone else that were presented for any

9    improper purpose under Rule 9011.[34]  Rule 9011, however, was not the basis for the

10   court's original OSC nor the foundation for the court's Amended OSC issued on

11   November 15, 2006.

12            1.  Inherent Authority

13            Sanctions may be imposed under various authority, including, among others,

14   Rule 9011 and the court's inherent power.  See, e.g., Chambers v. NASCO, Inc., 501

15   U.S. 32, 46 (1991) (stating there is "no basis for holding that the sanctioning scheme of

16   the statute and the rules displaces the inherent power to impose sanctions"); Daggett v.

17   Cardinale (In re Deville), 280 B.R. 483, 495 (9th Cir. BAP 2002) ("The inherent power to

18   sanction bad-faith conduct is a separate and distinct source of authority, which is not

19   displaced by the federal statutes and rules."), aff'd, 361 F.3d 539 (9th Cir. 2004).  A

20   bankruptcy court has inherent authority "to sanction a party who willfully disobeys court

21   orders or acts in bad faith, such as willful improper conduct."  Fjeldsted v. Lien (In re

22   Fjeldsted), 293 B.R. 12, 26 (9th Cir. BAP 2003).  Where a court imposes a sanction

23   _____

24   [32] Supplemental Brief from Dennis Winters Re Accounting Motion for Disgorgement, p.4, l.2-3.

25   [33] Id. at p.3, l.28 to p.4, l.1.

26   [34] Id. at p.4, l.4-5.

27                                              - 15 -

1    under its inherent power, it must make a finding of bad faith.  E.g., <u>Knupfer v. Lindblade</u>

2    (<u>In re Dyer</u>), 322 F.3d 1178, 1196 (9th Cir. 2003); <u>Fjeldsted</u>, 293 B.R. at 26; <u>Deville</u>, 280

3    B.R. at 495.

4           In its Amended OSC, the court specified both the authority for the sanction and

5    the sanctionable conduct.  <u>See Daggett v. Cardinale (In re Deville)</u>, 361 F.3d 539, 550

6    (9th Cir. 2004).  The Amended OSC served on Kalicki, Rosalind J. Kalicki and Winters

7    described the specific facts which the court deemed a violation of its February 9th

8    order, and stated that the court was considering exercising its inherent authority to

9    address the transgression.  The facts identified in the Amended OSC also form the

10   basis for civil contempt sanctions under § 105(a).[35]

11          2. <u>Civil Contempt</u>

12          Bankruptcy courts derive their civil contempt authority from § 105(a), which

13   provides:

14          The court may issue any order, process, or judgment that is necessary or
            appropriate to carry out the provisions of this title.  No provision of this title
15          providing for the raising of an issue by a party in interest shall be construed to
            preclude the court from, sua sponte, taking any action or making any
16          determination necessary or appropriate to enforce or implement court orders or
            rules, or to prevent an abuse of process.
17
     11 U.S.C. § 105(a).[36]  <u>See, e.g.</u>, <u>Zilog, Inc. v. Corning (In re Zilog, Inc.)</u>, 450 F.3d 996,
18

---

19   [35] Neither the original OSC nor the Amended OSC specifically refer to civil contempt, but both OSC's
     referred to the court's February 9th order and described the alleged violations of the order.  The court's
20   failure to specify civil contempt as an additional basis for sanctions does not undermine its sanctioning
     authority. <u>See</u> <u>DeVille</u>, 361 F.3d at 550.
21
     [36] In <u>Dyer</u>, the Ninth Circuit distinguished a bankruptcy court's civil contempt authority from its inherent
22   power to sanction, stating:

23          Civil contempt authority allows a court to remedy a violation of a specific order (including
            "automatic" orders, such as the automatic stay or discharge injunction).  The inherent sanction
24          authority allows a bankruptcy court to deter and provide compensation for a broad range of
            improper litigation tactics.
25
            The inherent sanction authority differs from the civil contempt authority in an additional respect as
26          well.  Before imposing sanctions under its inherent sanctioning authority, a court must make an

27                                                - 16 -

1    1007 (9th Cir. 2006) ("A party who knowingly violates the discharge injunction can be

2    held in contempt under section 105(a) of the bankruptcy code."); Dyer, 322 F.3d at

3    1189-90 ("Although the availability of civil contempt sanctions under § 105(a) has a

4    checkered past in our circuit, the recent precedent makes clear that this remedy is

5    available." (footnote omitted)); Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 507 (9th

6    Cir. 2002) (holding that § 524(a) may be enforced by the bankruptcy court's contempt

7    power under § 105(a)); State of Cal. Employment Dev. Dep't. v. Taxel (In re Del Mission

8    Ltd.), 98 F.3d 1147, 1152 n.5 (9th Cir. 1996) (observing that § 105(a) "is the authority

9    that authorizes a bankruptcy court to award sanctions for ordinary civil contempt");

10   Havelock v. Taxel (In re Pace), 67 F.3d 187, 193 (9th Cir. 1995) (holding that "a trustee

11   can recover damages in the form of costs and attorney's fees under section 105(a) as a

12   sanction for ordinary civil contempt").  Civil contempt is an effective remedy for

13   redressing the violation of a cash collateral order.  In re Spanish River Plaza Realty Co.,

14   Ltd., 155 B.R. 249, 253 (Bankr. S.D. Fla. 1993); see In re Krisle, 54 B.R. 330, 337

15   (Bankr. D.S.D. 1985) (holding that the debtor in possession "was liable for civil

16   contempt when he disobeyed th[e] Court's order to turn over the cash collateral and

17   violated 11 U.S.C. § 363").

18        In a civil contempt action, the moving party has the burden of establishing "by

19   clear and convincing evidence that the contemnors violated a specific and definite order

20   of the court.  The burden then shifts to the contemnors to demonstrate why they were

21   _____

22   explicit finding of bad faith or willful misconduct.  In this context, "willful misconduct" carries a
     different meaning than the meaning employed in the context of determining whether an individual

23   is entitled to damages under § 362(h) or a contempt judgment under § 105(a) for an automatic
     stay violation.  With regard to the inherent sanction authority, bad faith or willful misconduct

24   consists of something more egregious than mere negligence or recklessness.  Although "specific
     intent to violate the automatic stay" may not be required in the contempt context, such specific

25   intent or other conduct in "bad faith or conduct tantamount to bad faith," is necessary to impose
     sanctions under the bankruptcy court's inherent power.

26   322 F.3d at 1196 (citations omitted).

27                                      - 17 -

1   unable to comply." <u>FTC v. Affordable Media, LLC</u>, 179 F.3d 1228, 1239 (9th Cir. 1999)

2   (quoting <u>Stone v. City & County of S.F.</u>, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (citations

3   omitted), <u>cert. denied</u>, 506 U.S. 1081 (1993)); <u>see, e.g.</u>, <u>Reno Air Racing Ass'n, Inc. v.</u>

4   <u>McCord</u>, 452 F.3d 1126, 1130 (9th Cir. 2006) ("'Civil contempt . . . consists of a party's

5   disobedience to a specific and definite court order by failure to take all reasonable steps

6   within the party's power to comply.'"(quoting <u>Go-Video, Inc. v. The Motion Picture Ass'n</u>

7   <u>of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litigation)</u>, 10 F.3d 693, 695

8   (9th Cir. 1993)); <u>Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.</u>, 689 F.2d 885, 889

9   (9th Cir. 1982) (observing that the standard for civil contempt is "clear and convincing

10  evidence"); <u>Balla v. Idaho State Bd. of Corrections</u>, 869 F.2d 461, 465 (9th Cir. 1989)

11  (stating that civil contempt may be found when a party fails to comply with an order that

12  is both specific and definite).  The court is not required to find that a party willfully or

13  intentionally failed to comply, nor is "good faith" a defense.  <u>See, e.g.</u>, <u>Dual-Deck Video</u>,

14  10 F.3d at 695 (stating that "there is no good faith exception to the requirement of

15  obedience to a court order"); <u>Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus.,</u>

16  <u>Inc. (In re Crystal Palace Gambling Hall, Inc.)</u>, 817 F.2d 1361, 1365 (9th Cir. 1987)

17  (opining that "the contempt need not be willful" and that a "'good faith' exception to the

18  requirement of obedience to a court order has no basis in law"); <u>General Signal Corp. v.</u>

19  <u>Donallco, Inc.</u>, 787 F.2d 1376, 1379 (9th Cir. 1985) ("Failure to comply need not be

20  intentional."); <u>Donovan v. Mazzola</u>, 716 F.2d 1226, 1240 (9th Cir. 1983) ("Intent is not

21  an issue in civil contempt proceedings.").

22        Punishment for civil contempt must be either coercive or compensatory.[37]  <u>Dyer</u>,

23

───────────────

24  [37] Criminal or punitive sanctions may not be imposed by a bankruptcy court under § 105(a).  <u>Dyer</u>, 322
F.3d at 1192; <u>Price v. Lehtinen (In re Lehtinen)</u>, 332 B.R. 404, 412 (9th Cir. BAP 2005).  "'Criminal
contempt is a crime in the ordinary sense.'"  <u>Int'l Union United Mine Workers of Am. v. Bagwell</u>, 512 U.S.

25  821, 826 (1994) (quoting <u>Bloom v. Illinois</u>, 391 U.S. 194, 201 (1968)).  In <u>Hicks v. Feiock</u>, the Supreme
Court distinguished the nature of the relief available in criminal and civil contempt actions, explaining:

26

27                            - 18 -

1  322 F.3d at 1192; <u>F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.</u>, 244 F.3d

2  1128, 1137-38 (9th Cir. 2001); <u>Falstaff Brewing Corp. v. Miller Brewing Co.</u>, 702 F.2d

3  770, 778 (9th Cir. 1983); <u>Oliner v. Kontrabecki</u>, 305 B.R. 510, 520 (N.D. Cal. 2004),

4  <u>appeal dism'd</u>, 158 Fed. Appx. 1 (9th Cir. 2005).  Civil contempt sanctions must be

5  wholly remedial and serve either to coerce an individual into future compliance with the

6  court's order or to compensate the complainant for losses resulting from the

7  contemnor's past noncompliance.  <u>See, e.g.</u>, <u>Bagwell</u>, 512 U.S. at 829; <u>United States v</u>

8  <u>United Mine Workers of Am.</u>, 330 U.S. 258, 303-04 (1947); <u>Falstaff</u>, 702 F.2d at 778.

9         Incarceration is an appropriate coercive sanction for civil contempt so long as

10  "the contemnor can avoid the sentence imposed on him, or purge himself of it, by

11  complying with the terms of the original order."  <u>Hicks</u>, 485 U.S. at 635 n.7.  "When the

12  petitioners carry 'the keys of their prison in their own pockets,' the action 'is essentially

13  a civil remedy designed for the benefit of other parties and has quite properly been

14  exercised for centuries to secure compliance with judicial decrees.'"  <u>Shillitani v. United</u>

15  <u>States</u>, 384 U.S. 364, 368 (1966) (citations omitted).

16         Alternatively, a fine may be payable to the complainant as compensation for

17

18  _____

19  [T]he critical features are the substance of the proceeding and the character of the relief that the proceeding will afford.  "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant.  But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court."  The character of the relief imposed is thus ascertainable by applying a few straightforward rules.  If the relief provided is a sentence of imprisonment, it is remedial if "the defendant stands committed unless and until he performs the affirmative act required by the court's order," and is punitive if "the sentence is limited to imprisonment for a definite period."  If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order.  These distinctions lead up to the fundamental proposition that criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt.

485 U.S. 624, 632-33 (1988) (quoting <u>Gompers v. Bucks Stove & Range Co.</u>, 221 U.S. 418, 442-44 (1911)) (internal citations omitted).

1   damages caused by the contemnor's noncompliance. <u>Hicks</u>, 485 U.S. at 632; <u>Portland</u>

2   <u>Feminist Women's Health Ctr. v. Advocates for Life, Inc.</u>, 877 F.2d 787, 790 (9th Cir.

3   1989). A compensatory fine must be limited to actual damages incurred as a result of

4   the violation. <u>See, e.g.</u>, <u>United Mine Workers of Am.</u>, 330 U.S. at 304 (stating that a

5   compensatory fine must "be based upon evidence of complainant's actual loss, and his

6   right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the

7   basic controversy"); <u>Crystal Palace</u>, 817 F.2d at 1366 (observing that "an award to an

8   opposing party is limited by that party's actual loss"); <u>Shuffler v. Heritage Bank</u>, 720

9   F.2d 1141, 1148 (9th Cir. 1983) (stating that compensatory awards are limited to "actual

10  losses sustained as a result of the contumacy"). Actual loss includes attorneys fees

11  and costs incurred in securing compliance with the order. <u>Dyer</u>, 322 F.3d at 1195

12  (stating that "attorneys fees are an appropriate component of a civil contempt award");

13  <u>Portland Feminist</u>, 877 F.2d at 790 (upholding an award of costs incurred litigating the

14  contempt proceeding, including reasonable attorney's fees, as a remedial sanction);

15  <u>Perry v. O'Donnell</u>, 759 F.2d 702, 705 (9th Cir. 1985) (concluding that "an award of fees

16  and expenses is appropriate as a remedial measure"). Where the fine is not

17  compensatory, it is civil only if the contemnor is able to avoid paying the amount

18  imposed by performing the act required by the court's order. <u>Bagwell</u>, 512 U.S. at 829;

19  <u>Hicks</u>, 485 U.S. at 632; <u>Portland Feminist</u>, 877 F.2d at 790; <u>see</u> <u>F.J. Hanshaw</u>, 244

20  F.3d at 1138 (holding that an unconditional fine of $500,000 was criminal in nature

21  because it was neither intended to be compensatory nor could it be avoided by future

22  compliance).

23      Substantial compliance with the terms of a court's order is a defense to civil

24  contempt. <u>Dual-Deck Video</u>, 10 F.3d at 695. <u>Vertex Distrib.</u>, 689 F.2d at 891. To

25  establish substantial compliance, the contemnor must show that he took all reasonable

26

27                                      - 20 -

1   steps within his power to comply. <u>Stone</u>, 968 F.2d at 856 ("This Circuit's rule with

2   regard to contempt has long been whether the defendants have performed 'all

3   reasonable steps within their power to insure compliance' with the court's orders");

4   <u>Richmark Corp. v. Timber Falling Consultants</u>, 959 F.2d 1468, 1479 (9th Cir. 1992)

5   (stating that "contempt is inappropriate where a party has taken 'all the reasonable

6   steps' it can take to comply" (quoting <u>Balla</u>, 869 F.2d at 466)); <u>Sekaquaptewa v.</u>

7   <u>MacDonald</u>, 544 F.2d 396, 406 (9th Cir. 1976) (concluding that "appellants have not

8   taken all the reasonable steps within their power to insure compliance with the orders").

9   Where the contemnor has made every reasonable effort to comply, a technical or

10  inadvertent violation of the court's order will not support a finding of civil contempt. <u>See</u>

11  <u>Dual-Deck Video</u>, 10 F.3d at 695; <u>General Signal</u>, 787 F.2d at 1379.  Nor is civil

12  contempt appropriate where the violation "'appears to be based on a good faith and

13  reasonable interpretation of [the court's order].'" <u>Vertex Distrib</u>, 689 F.2d at 889

14  (quoting <u>Rinehart v. Brewer</u>, 483 F. Supp. 165, 171 (S.D. Iowa 1980)).

15          Inability to comply with the court's order is also a defense to civil contempt.

16  <u>United States v. Rylander</u>, 460 U.S. 752, 757 (1983) ("Where compliance is impossible,

17  neither the moving party nor the court has any reason to proceed with the civil contempt

18  action."); <u>Affordable Media</u>, 179 F.3d at 1239 (stating that "[a] party's inability to comply

19  with a judicial order constitutes a defense to a charge of civil contempt").  The burden is

20  on the contemnor to establish "'categorically and in detail'" why he has the present

21  inability to comply with the court's order. <u>Affordable Media</u>, 179 F.3d at 1241 (quoting

22  <u>N.L.R.B. v. Trans Ocean Export Packing, Inc</u>, 473 F.2d 612, 616 (9th Cir. 1973));

23  <u>Richmark</u>, 959 F.2d at 1481 (stating that the contemnor must establish "that it is

24  'factually impossible' to comply with the . . . order" (emphasis in original)); <u>Oliner</u>, 305

25  B.R. at 520 (opining that "the burden is on the alleged contemnor to show 'categorically

26

27                                  - 21 -

1    and in detail' why he is unable to comply").  The defense is not available, however,

2    "when the person charged is responsible for the inability to comply." <u>United States v.</u>

3    <u>Asay</u>, 614 F.2d 655, 660 (9th Cir. 1980) ("Self-induced inability is not a defense to a

4    contempt proceeding.")

5            3.  <u>Breach of Fiduciary Duty and Violation of Court Order</u>

6            By virtue of § 1107(a), a chapter 11 debtor in possession stands in the shoes of

7    a trustee and is a fiduciary for the estate and its creditors.  <u>See, e.g., Thompson v.</u>

8    <u>Margen (In re McConville)</u>, 110 F.3d 47, 50 (9th Cir. 1997) (stating that chapter 11

9    debtors in possession "were fiduciaries of their own estate owing a duty of care and

10   loyalty to the estate's creditors"), <u>cert. denied</u>, 522 U.S. 966 (1997); <u>Woodson v.</u>

11   <u>Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610, 614 (9th Cir. 1988) ("As debtor

12   in possession he is the trustee of his own estate and therefore stands in a fiduciary

13   relationship to his creditors" (footnote omitted)); <u>Devers v. Bank of Sheridan, Montana</u>

14   <u>(In re Devers)</u>, 759 F.2d 751, 754 (9th Cir. 1985) ("A debtor-in-possession has the duty

15   to protect and conserve property in his possession for the benefit of creditors").

16          When the debtor is a corporation, the debtor in possession's fiduciary obligations

17   to the corporation, its creditors and shareholders, fall upon the officers and directors.

18   <u>See Commodity Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343, 355 (1985)

19   (stating that "the debtor's directors bear essentially the same fiduciary obligation to

20   creditors and shareholders as would the trustee for a debtor out of possession"); <u>Wolf</u>

21   <u>v. Weinstein</u>, 372 U.S. 633, 649 (1963) (observing that "so long as the Debtor remains

22   in possession, it is clear that the <u>corporation</u> bears essentially the same fiduciary

23   obligation to the creditors as does the trustee for the Debtor out of possession"

24   (emphasis in original)); <u>Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)</u>, 145 B.R.

25   637, 643 (9th Cir. BAP 1992) ("When the debtor is a corporation, corporate officers and

26

27                                         - 22 -